IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 12, 2015

**JAMES DREW FREEMAN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for White County**
**No. CR-3544      Leon C. Burns, Judge**

_____

**No. M2014-02141-CCA-R3-PC – Filed November 13, 2015**

_____

The Petitioner, James Drew Freeman, appeals from the denial of post-conviction relief by the Criminal Court for White County.  He was convicted of second degree murder of his mother and sentenced to seventeen years' imprisonment.  On appeal, the Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to locate and call a witness.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Daniel J. Barnes, Sparta, Tennessee (on appeal), and Larry G. Bryant, McMinnville, Tennessee (at hearing), for the Petitioner, James Drew Freeman.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall A. York, District Attorney General; and Gary S. McKenzie and Philip A. Hatch, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

This case arises from the shooting death of the victim, Zella Freeman, on August 2, 2008.  As a result, the Petitioner, James Drew Freeman, was indicted by the White County Grand Jury for second degree murder.  After a jury trial, the Petitioner was convicted as charged for his mother's homicide.  He was subsequently sentenced to seventeen years' incarceration, to be served at 100 percent as a violent offender.  A full recitation of the underlying facts can be found in this court's opinion on direct appeal.  See State v. James Drew Freeman, Jr., No. M2011-00184-CCA-R3-CD, 2012 WL 1656975, at *1-9 (Tenn. Crim. App. May 9, 2012), perm. app. denied (Tenn. Oct. 17, 2012).

The evidence at trial established that shortly before 8:00 p.m. on August 2, 2008, Peggy and Dewey Swindell observed a body being dumped at Old Bon Air Cemetery. Id. at *1. The witnesses further reported seeing a small, maroon vehicle leave the scene. Id.

Investigators from the White County Sheriff's Department and the Tennessee Bureau of Investigation (TBI) responded to the scene and observed the body of an elderly woman lying in the gravel driveway of the cemetery. Id. at *1, *5. The victim "was lying on her back in a pool of blood" and had sustained leg injuries from tire tracks. Id. at *3. TBI Agent Dan Friel testified that "none of the forensic evidence suggested that more than one vehicle had been involved in dumping the victim's body and causing her injuries." Id. at *1.

At 9:17 p.m. that evening, the victim's neighbor, Larry Johnson, called 911 to report that the Petitioner "was on his front porch" and had informed Johnson that "his mother had been shot with a shotgun at the Old Bon Air Cemetery." Id. at *3. Until Johnson's call, the authorities did not have any information that a shotgun was involved in the incident. Id. The call was also significant because law enforcement could not identify the victim. They did not discover the victim's shotgun wound on her back until around 11:30 p.m. when the body was turned over. Id. at *5.

At trial, Johnson testified that he saw the Petitioner and his two sisters at the victim's home early on the day of her death. Id. at *2. The victim's daughters left the residence after lunch. Johnson did not observe any vehicles in the victim's driveway at around 6:00 p.m. He subsequently heard "a car door slam" around 8:30 or 9:00 p.m. Johnson said that the Petitioner came to his front door and repeatedly stated, "Mama's dead. Mama's dead. Mama's dead." The Petitioner reportedly told Johnson that "a real estate man" had shot the victim in the back and that she was dressed in a pink nightgown and was located at the Old Bon Air Cemetery. Id. After Johnson called 911 to inquire "if there was a lady shot and run over at the cemetery[,]" detectives told him to keep the Petitioner at his home. Id.

Upon arriving at the victim's residence, White County Sheriff's Department detectives observed the Petitioner standing in the yard with his hands in his pockets. They patted the Petitioner down as a safety precaution and found "two sets of car keys, some pill bottles, and . . . a shotgun shell." Id. at *3. Detective Chris Isham informed the Petitioner of his Miranda rights at that point and questioned him. Id. Because the Petitioner relayed information that was only known to law enforcement and the perpetrator, Detective Isham questioned the Petitioner further about the "man" who had allegedly harmed his mother. The Petitioner never provided Detective Isham with an identity, and the victim was dressed exactly as the Petitioner had described. Id. The

Petitioner also admitted that he owned a shotgun and that his friend had a .20 gauge shotgun. Id. at *4. During a search of the victim's residence, Detective Isham observed the Petitioner's small, maroon Buick parked in the driveway. Id. Law enforcement subsequently towed the vehicle, and TBI agents conducted various forensic tests on it. Id. at *4, *5, *8. Six days after the homicide, law enforcement recovered the following items in the weeded area near the victim's property: the victim's purse, a .20 gauge shotgun, and a box of shotgun shells with three missing shells. Id. at *4. Detective Isham stated that the box of shells matched the shotgun shell found in the Petitioner's pocket. Id.

Forensic evidence established that the victim suffered a single shotgun wound to her back and fractures to her lower legs. Id. at *5. In its opinion on direct appeal, this court summarized some of the expert testimony as follows:

> Former TBI Special Agent Laura Lee Staples testified that she performed deoxyribonucleic acid ("DNA") testing on several items in conjunction with the investigation into the victim's death. Testing on stains on the tires of the [Petitioner]'s vehicle "'indicated the presence of blood[ ] but failed to indicate a stain of human origin.'" Additionally, stains on the undercarriage of the vehicle proved to be blood of non-human origin. A stain on the muffler, however, was human blood, but Ms. Staples was unable "to obtain a DNA profile due to insufficient or degraded DNA." Gravel taken from the cemetery driveway tested positive for the presence of the victim's blood. The [Petitioner]'s clothing tested positive for the blood of "an unknown male contributor."
>
> TBI Special Agent Dan Royce, who was certified as a firearms expert, testified that he examined "a .20 gauge shot shell and shot shell case" as well as "112 shot pellets from the victim, a plastic shot wad from the victim, a pink nightgown from the victim, a blue and white striped housecoat from the victim, a Harrington & Richardson .20 gauge shotgun, a fired .20 gauge shot shell case, and a box containing 22 unfired Remington .20 gauge shot shells." Agent Royce testified that the fired shot shell recovered from the [Petitioner]'s residence was "basically indistinguishable" from the intact shell recovered from the [Petitioner]'s pocket on the night of the victim's murder. He said that the pellets recovered from the victim's body were consistent in "size and weight specifications" with the shot in the live shot shell recovered from the [Petitioner]'s pocket, as was the .20 gauge plastic shot wad. Agent Royce testified that he performed tests to determine whether the fired shell recovered from the [Petitioner]'s residence had been fired from the gun

recovered near the victim's residence. He said that "the fired shot shell had the same shape and contour and size of firing pin impression on it" but that the primer on the fired shot shell case "was so corroded" that he could not match it specifically to the shotgun found by Detective Isham. Based upon tests he performed on the victim's clothing, Agent Royce concluded that the victim was shot from a distance "greater than four feet, but less than eight feet." Agent Royce testified that, because of its design, the shotgun in this case would only eject gunshot residue from the muzzle, making it "much less likely" that the shooter's hands or clothes would test positive for gunshot residue.

Id. at *6-7. The State introduced the Petitioner's version of the events through the testimony of Detective Ruben Hormilla of the White County Sheriff's Department. Id. at *7. An audio recording of the Petitioner's interview was played for the jury. This court summarized the State's evidence as follows:

During the interview, the [Petitioner] told Detective Hormilla that the victim told him that she planned to meet with "a man" about "some annuities" on the day that she was murdered. He said that he spent part of the day with the victim and his sisters and that at approximately 10:30 or 11:00 a.m., his sisters drove him to his residence to pick up some dogs. The [Petitioner] said that his car "never even moved" at any point on the day of the victim's murder and that [his sisters] left from his house to go directly to Charlotte, North Carolina.

The [Petitioner] denied telling Mr. Johnson that the victim was dead and maintained that Mr. Johnson had "told a lie on" him. The [Petitioner] claimed, however, that "someone at Mapco" had told him before he went to Mr. Johnson's that "somebody that was kin" to the [Petitioner] was "up on the mountain and they didn't know" if the person was dead or alive. The [Petitioner] said that he "didn't know how" the man at Mapco knew that the victim had been killed. He said that he walked from the Mapco to the victim's residence and sat on the porch after realizing that the victim was not home.

The [Petitioner] said that he last spoke with the victim via telephone at approximately 1:00 p.m. He insisted that the victim "went off with a man because of that house down there plus he was with the annuities." The [Petitioner] said that he did not ask the victim the identity of the annuity man because he "did not get into" the victim's "business." He also said "a robbery could be involved in this" because an "IB" card had been stolen

-4-

from the victim on the day before she was killed and because the victim "had a lot of money." The [Petitioner] said he was "so mixed up" on the day of the victim's death because of the poor condition of his feet, the fact that dogs were being killed, and the fact that he had not seen his sister Nell "in five or six years."

Regarding the .20 gauge shotgun and shells discovered in conjunction with the investigation, the [Petitioner] said that a "guy from Charlotte" whose name he could not recall and who was "dead by now," had left them at his residence. He claimed that he found the shotgun shell that officers found in his pocket next to a bench he likes to sit on near his residence.

Id. at *7-8. Detective Hormilla testified that his investigation did not reveal that robbery was a motive in the victim's murder. A Mapco employee testified that she was working on August 2, 2008, and she did not recall anyone entering the store to report that there was a body at Old Bon Air Cemetery. Id. at *8.

The defense called multiple TBI forensic scientists to support its theory that the Petitioner's vehicle was not connected to the crime. Id. Special Agent Linda Littlejohn did not find any matches between hair and fiber samples collected from the victim and from the exterior of the maroon Buick. Special Agent Miranda Terry "found a paint chip on the victim's housecoat that did not match the paint of the [Petitioner]'s vehicle." Id. Special Agent Elizabeth Reid examined "a shotgun, a shot shell case, and a box of shells" and did not find any latent fingerprints. Id.

On direct appeal, the Petitioner argued that the evidence was insufficient to support his conviction and that the trial court erred by allowing a doctor to testify regarding an autopsy that he did not personally perform. Id. at *1. The Petitioner further asserted that the prosecutor's closing argument was improper and inflammatory. Id. This court affirmed the conviction, concluding in part that the evidence was sufficient to establish the Petitioner's identity as the perpetrator. Id. at *16. The Tennessee Supreme Court denied the Petitioner's application for permission to appeal on October 17, 2012.

On October 9, 2013, the White County court clerk received a letter from the Petitioner requesting assistance with filing his case "to a higher court" to avoid the October 17 deadline. On October 15, 2013, the Petitioner's trial counsel filed a motion asking the trial court to appoint post-conviction counsel for the Petitioner. The court treated the filings as a pro se petition for post-conviction relief and appointed counsel for the Petitioner. The Petitioner subsequently filed a pro se petition for post-conviction

relief and an amended petition with the assistance of counsel. The evidentiary hearing occurred on October 14, 2014.[1]

**Post-Conviction Hearing.** The Petitioner testified that in preparation for trial, he informed trial counsel that a man had worked on his car at a muffler shop. According to the Petitioner, a woman had rear-ended his car "just weeks prior" to his mother's death. The man had to repair the tail lights and the rear section of the vehicle. Because there was some sharp metal, the man cut his hand and bled on the car's muffler. The Petitioner believed that trial counsel should have called the mechanic to testify at trial.

On cross-examination, the Petitioner acknowledged that trial counsel was assisted by a former prosecutor who had thirty years of experience. He agreed that the theory of the defense was that his car was not involved in the homicide. He told trial counsel to look for the mechanic at the muffler shop, but he did not provide the employee's name or a physical description. He said he gave the employee's work phone number to trial counsel. The Petitioner stated that he met with counsel "about seven" times.

Shoney Tongate testified that he had been working at Coffman Muffler for six years and that he was acquainted with the Petitioner as a customer. He said that he had repaired the Petitioner's taillights after the vehicle had been hit from behind. According to Tongate, "[t]he exhaust was bent up" and "had to be cut and replaced." He then cut his hand while "putting the pipe together." He agreed that in January 2014, post-conviction counsel called Coffman Muffler and spoke with the owner about the instant case. He also agreed that he returned the attorney's call within ten minutes. Tongate did not recall when he worked on the Petitioner's vehicle. He said that the bleeding incident "could have been a few months" but not as long as a year before the homicide, and only his brother knew about it.

Trial counsel testified that he had been practicing law for nearly two decades. He said that he was briefly employed as an assistant district attorney and that he spent most of his career in private practice. He had experience in "numerous" criminal investigations and trials, including six homicide trials. Trial counsel was retained in this case after two other attorneys had initially been involved. He stated that the Petitioner's sister previously hired an investigator, Ken Guidara, who had conducted an extensive investigation. After counsel was retained, he hired the same investigator to work for him. He estimated that he "spent probably 100 hours or so" discussing the case with the

---

[1] On appeal, the Petitioner raised the sole issue of ineffective assistance of counsel regarding the failure to locate and call Shoney Tongate to testify at trial. Accordingly, we only address testimony from the hearing relevant to this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Petitioner in the year leading up to trial. The defense team included trial counsel, the investigator, the Petitioner, and an experienced former prosecutor.

Trial counsel said that the Petitioner informed him of the incident concerning the muffler, but the Petitioner did not provide a name or a description of the person who cut his hand. Counsel never located the witness, and he did not know the identity of Shoney Tongate until post-conviction counsel found the witness. He believed that "[e]very drop of blood in the homicide investigation . . . [wa]s significant." He recalled that the human blood on the muffler was degraded and could not be linked to any particular individual or gender. He agreed that the State adopted the position that the blood on the muffler came from the victim. When asked whether he should have called a witness to refute the State's theory, trial counsel responded:

> I would have called that witness, no question, and it would have been important for me to do that. I would also say, though, that -- and that's why we looked so diligently for that witness. [The Petitioner] had identified, or had made the representation to me, that there -- the spot of human blood on the muffler could be from the mechanic from Coffman's, which is why we launched an investigation to search for him. I called personally to Coffman's and stopped by there after court one afternoon looking for somebody who would own up to the fact that they had bled on the muffler. I was not successful. I don't know whether people didn't want to come forward, didn't want to get involved. That's obviously normal in our business. But I couldn't get any human being to tell me that they had bled on the muffler. At which point, I began to correspond with, and essentially plead with, [the Petitioner] and his family to go find the person for me, bring them in, give me -- give me their name, give me a phone number, something. Let me -- aid me in connecting with this person who has this valuable testimony. I even wrote a letter to the Freemans in July of '09, I think it was, asking for just that information. And even though I spent over a year with them, working with them on a weekly basis, and have hours and hours of one-on-one time with [the Petitioner] and his family, they were never able to do that for me, and I hate it. I could have called the gentleman as a witness, and it would have been one more indication that this car had nothing to do with this murder, and I -- I believed that during trial, and I believe it here today, that it had nothing to do with this murder.

Trial counsel described in detail the attempts that he and his investigator undertook to locate an alleged alibi witness named Cecil Lawson. Despite their efforts, they were unsuccessful. They also could not find any witness from Mapco who had

-7-

informed the Petitioner about his mother's death. Trial counsel stated that he personally interviewed several witnesses regarding the operability of the Petitioner's vehicle. He concluded that the testimony of the detectives and the next door neighbor supported the fact that the car was operable. He noted that multiple forensic scientists examined the Petitioner's car in detail and that "[t]here was absolutely no scientific or forensic evidence that connected that vehicle to this crime." Counsel said that the Petitioner's version of the events was encapsulated in the official statement to Detective Ruben Hormilla.

Kenneth Guidara testified that he was a private investigator who was initially hired by the Petitioner's sister. Before he started working for trial counsel, he had conducted at least fifty hours of investigation in the Petitioner's case. At first, the Petitioner provided him with a list of witnesses; subsequently, trial counsel asked him to locate witnesses. Guidara was not involved in locating a possible witness from Coffman's Muffler. He testified that if trial counsel personally went to a location to find a witness, there was nothing more that he could have done as an investigator. He said that it would not be possible to find a witness without a name, telephone number, or description of the individual. He estimated that he spent a total of seventy-five hours investigating the Petitioner's case.

At the conclusion of the hearing, the post-conviction court made oral findings of fact and conclusions of law and denied relief on all claims. The court specifically found that the Petitioner "was afforded effective counsel" and that "there was no prejudice to the extent that it would have changed the outcome of the trial." On October 27, 2014, the court entered a written order denying post-conviction relief. The Petitioner filed a timely notice of appeal.

## ANALYSIS

On appeal, the Petitioner argues that trial counsel was ineffective in failing to locate and call Shoney Tongate to testify at trial. He contends that the witness could have explained the presence of human blood on the muffler of the Petitioner's vehicle. He further asserts that the evidence preponderates against the post-conviction court's findings that trial counsel conducted a reasonable investigation because post-conviction counsel was able to easily locate Tongate within minutes of calling the muffler shop. The Petitioner argues that trial counsel's omission prevented him from presenting exculpatory evidence that could have altered the outcome at trial. We conclude that the court properly denied post-conviction relief.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a

constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component."

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

In denying relief based on trial counsel's failure to call Shoney Tongate, the post-conviction court found that the witness could not recall when he had worked on the Petitioner's vehicle. It further found that there was no evidence at trial regarding the source of the human blood on the muffler. The court specifically accredited trial counsel's testimony that he made the effort to locate the witness by calling and visiting the muffler shop, though he was unsuccessful in identifying the individual. The court noted that trial counsel conducted a reasonable investigation and that his inability to locate the witness could not be attributed to ineffective assistance where no one would admit to bleeding on the muffler. The court opined that although Tongate's testimony "might have been some help," the evidence would not have made a difference in the outcome of the trial. The court concluded that the Petitioner received effective assistance of counsel and that "counsel was not derelict in the presentation and investigation of the case."

We agree that the Petitioner has failed to demonstrate deficient performance based on counsel's failure to procure Shoney Tongate as a witness. At the evidentiary hearing, Tongate testified that he cut his hand when he worked on the Petitioner's car. He recalled that the incident may have occurred a few months before the victim's death and that he only told his brother about it. Trial counsel testified that he would have called

Tongate at trial if he could have identified him during the investigation. He personally called Coffman Muffler and visited the business to inquire about the blood stain, but witnesses were reluctant to come forward or be involved. Counsel also sought help from the Petitioner and his family to locate the witness, but he did not receive any assistance. Private investigator Ken Guidara stated that he would not be able to locate a witness without a name, phone number, or a physical description. He said that if trial counsel personally searched for a potential witness, then there was not more that he could contribute to the investigation. The Petitioner testified that he did not provide counsel with the name of the mechanic or any identifying characteristics. However, he did give counsel the name and telephone number of the business. Although post-conviction counsel located Tongate six years after the victim's homicide, the post-conviction court accredited trial counsel's testimony regarding his prior efforts to identify the witness. Based on our review of the record, we cannot conclude that counsel's investigation fell below an objective standard of reasonableness. See Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936).

We further note that the Petitioner has not demonstrated prejudice arising from trial counsel's alleged deficiency. While Tongate's testimony would have explained the presence of human blood on the Petitioner's muffler, we cannot say that its omission would have altered the outcome of the trial given the abundance of inculpatory evidence. See James Drew Freeman, Jr., 2012 WL 1656975, at *16 (summarizing the evidence presented at trial establishing the Petitioner's identity as the perpetrator). Accordingly, the Petitioner has not shown a reasonable probability that the result of the proceeding would have been different, and he is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE